*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

SPECTRUM HEALTH HOSPITALS and
SPECTRUM HEALTH PRIMARY CARE
PARTNERS d/b/a SPECTRUM HEALTH
MEDICAL GROUP,

UNPUBLISHED
May 18, 2023

Plaintiffs-Appellants,

v

No. 362042
Kent Circuit Court
LC No. 21-000594-NF

CITIZENS INSURANCE COMPANY OF
AMERICA, CITIZENS INSURANCE COMPANY
OF THE MIDWEST, HANOVER INSURANCE
COMPANY, and HANOVER AMERICAN
INSURANCE COMPANY,

Defendants-Appellees.

Before: RICK, P.J., and SHAPIRO and O'BRIEN, JJ.

PER CURIAM.

Plaintiffs appeal as of right the trial court's opinions and orders denying their motion for summary disposition and granting defendants' competing motion for summary disposition. At issue is whether defendants are liable to pay for treatment that plaintiffs provided to Timothy Wolf after January 6, 2020, for injuries that allegedly arose out of a September 2018 motor vehicle accident. The trial court held that defendants were not liable to pay no-fault benefits because Wolf failed to use reasonable efforts to obtain workers' compensation benefits before pursuing no-fault benefits. We reverse and remand for further proceedings.

## I. BACKGROUND

On September 24, 2018, Wolf, while riding a moped, was in an accident with a motor vehicle. Wolf suffered a grade 3 acromioclavicular (AC) joint separation to his left shoulder as a result of the accident. A radiology report following the accident shows that the separation measured 13 mm. Wolf eventually returned to work after this accident, but on June 24, 2019, Wolf

was admitted to the emergency room because he aggravated his left shoulder reaching under a desk at work. No further imaging of Wolf's shoulder was taken at the time.

On December 13, 2019, Wolf met with Dr. Matthew Boyd, who took x-rays of plaintiff's shoulder. After reviewing the images, Dr. Boyd found that Wolf's injury had worsened to a grade 5 AC joint separation. Wolf's case management notes from the visit state that Dr. Boyd opined that Wolf's shoulder would "[u]ltimately require surgery."

On January 6, 2020, Wolf was admitted to the emergency room again for a left shoulder injury. The report from this visit notes that Wolf reported having "a known [AC] joint tear" that "will need to have surgery," although the surgery was not yet scheduled. The report states that Wolf was "lifting parts at work" when he felt an "increased pain in the left shoulder." The report also states that x-rays "reveal[ed] a grade 3 [AC] joint separation without any acute fracture." The report concludes that Wolf was placed in a sling and "advised to follow-up with his company physician for reevaluation since the acute injury is actually work-related now[,] however his longer term issue is the significant separation of his left [AC] joint that will require surgery." The radiology report from Wolf's visit notes that Wolf's "clavicle [was] elevated nearly 4 cm from the acromion process which is a change from the previous chest x-ray."

Wolf's workplace recorded the incident on the day it happened—January 6, 2020. Following the incident, neither the workplace nor Wolf's temp agency was able to connect with Wolf to gather details about what happened or file any "required paperwork." Ultimately, Wolf's workplace considered the incident a "near-miss not a recordable to OSHA," so none of the paperwork necessary for Wolf to receive workers' compensation benefits was filed.

Wolf went to see Dr. Boyd again on January 8, 2020, and Dr. Boyd confirmed that Wolf had a grade 5 AC joint separation that would require surgery.

During discovery, Wolf testified that he was treated by his primary care doctor and a surgeon following the September 2018 accident. Wolf confirmed that after he met with his surgeon in October 2018, but he decided not to explore further surgical intervention for his shoulder at that time. Wolf explained that he "hoped initially that the pain would just—that it would just go away," and that he wanted to return to work quickly because he needed the money.

Wolf believed that, after the accident, he would sometimes miss work because of pain in his shoulder. Wolf explained that "using [his] shoulder caused pain, so working repetitive use of [his] shoulder wore it out quickly." Wolf clarified that "repetitive use of [his] shoulder" referred to being at work. Wolf "wouldn't say [he] was ever injured at work," but conceded that he would go to urgent care because he felt increased pain in his shoulder doing "work activity."

Wolf testified that he eventually sought surgery in 2020 because his initial hope that his shoulder would get better on its own no longer seemed realistic. He explained that, while his shoulder never got worse after the accident, it also never got any better.

Following Wolf's January 6, 2020 trip to the emergency room, defendants refused to pay any more of Wolf's medical expenses related to his AC joint separation, which led plaintiffs to file this lawsuit on January 20, 2021. The parties eventually filed competing motions for summary disposition. Defendants contended that they were entitled to summary disposition because (1)

Wolf's "two subsequent intervening work incidences objectively aggravated his shoulder separation from a grade 3 AC separation to a grade 5 AC separation" such that any causal connection between Wolf's accident and his grade 5 AC joint separation was severed, and (2) Wolf failed to pursue workers' compensation benefits, which precluded him from collecting benefits from defendants. In their competing motion for summary disposition, plaintiffs argued that defendants refused to pay benefits to plaintiffs solely because of a priority dispute, which is not a valid basis for denial. In response, defendants argued that this was not a priority dispute because there was no dispute about who bore responsibility to pay for Wolf's injuries—they contended that Wolf was required to use reasonable efforts to claim any available workers' compensation benefits, and defendants were required to subtract those benefits from any PIP benefits payable to Wolf.

On June 15, 2022, the trial court issued an opinion and order granting defendants' motion for summary disposition. The trial court explained that MCL 500.3109(1) required Wolf to seek workers' compensation benefits and permitted defendants to subtract those benefits from any PIP benefits payable to Wolf. The trial court then found that "although Plaintiffs argue there were no intervening injuries sustained at Mr. Wolf's workplace, Mr. Wolf reported two such incidents, which lead [sic] to exacerbation of his preexisting injuries" and thus fell under the workers' compensation statute. The court concluded that because "Wolf failed to follow through in pursuing a claim for workers compensation benefits and went directly to Defendants, despite the requirement he seek workers' compensation benefits first," defendants were entitled to summary disposition.

This appeal followed.

## II.  STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *Michigan Assn of Home Builders v City of Troy*, 504 Mich 204, 211; 934 NW2d 713 (2019). Both parties filed competing motions for summary disposition under MCR 2.116(C)(10). In *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999), our Supreme Court explained the process for reviewing a motion filed under MCR 2.116(C)(10):

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law.

A genuine issue of material fact exists when, after viewing the evidence in a light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

## III.  MCL 500.3105(1)

The parties first dispute whether Wolf's injuries requiring surgery arose out of his 2018 motor vehicle accident. While the trial court did not grant summary disposition on this ground,

we choose to address the issue for the sake of judicial economy. After reviewing all of the record evidence, we conclude that neither party is entitled to summary disposition because there exists a genuine issue of material fact whether Wolf's injury requiring surgery arose from the September 2018 motor vehicle accident.

Under the no-fault act, an insurer "is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle . . . ." MCL 500.3105(1). As explained by our Supreme Court:

> MCL 500.3105(1) imposes two causation requirements for no-fault benefits.
>
> First, an insurer is liable only if benefits are "for accidental bodily injury . . . ." "[F]or" implies a causal connection. "[A]ccidental bodily injury" therefore triggers an insurer's liability and defines the scope of that liability. Accordingly, a no-fault insurer is liable to pay benefits only to the extent that the claimed benefits are causally connected to the accidental bodily injury arising out of an automobile accident.
>
> Second, an insurer is liable to pay benefits for accidental bodily injury only if those injuries "aris[e] out of" or are caused by "the ownership, operation, maintenance or use of a motor vehicle . . . ." It is not any bodily injury that triggers an insurer's liability under the no-fault act. Rather, it is only those injuries that are caused by the insured's use of a motor vehicle. [*Griffith ex rel Griffith v State Farm Mut Auto Ins Co*, 472 Mich 521, 531; 697 NW2d 895 (2005) (footnote omitted).]

"Regarding the degree of causation between the injury and the use of the motor vehicle that must be shown, this Court has established that an injury arises out of the use of a motor vehicle as a motor vehicle when 'the causal connection between the injury and the use of a motor vehicle as a motor vehicle is more than incidental, fortuitous, or "but for." ' " *McPherson v McPherson*, 493 Mich 294, 297; 831 NW2d 219 (2013), quoting *Thornton v Allstate Ins Co*, 425 Mich 643, 659; 391 NW2d 320 (1986).[1] The passage of time and intervening events may render the causal

---

[1] Plaintiffs rely on *Bradley v Detroit Auto Inter-Ins Exch*, 130 Mich App 34, 41; 343 NW2d 506 (1983), for support of their assertion that "[a]n injury is compensable if it 'originat[es] from, ha[s] its origin in, grow[s] out of . . . flow[s] from, or in short, [is] incident to or [has a] connection with' the accident." In *Century Mut Ins Co v League Gen Ins Co*, 213 Mich App 114, 119-121; 541 NW2d 272 (1995), however, this Court explained that the line of cases using this standard are inconsistent with the causation standard announced in *Thornton*, and so considered that line of cases overruled. See also *Pac Employers Ins Co v Michigan Mut Ins Co*, 452 Mich 218, 225 n 8; 549 NW2d 872 (1996) (acknowledging that *Century Mut Ins* rejected the old standard as inconsistent with *Thornton*).

Plaintiffs also rely on *Scott v State Farm Mut Auto Ins Co*, 278 Mich App 578; 751 NW2d 51(2008), and while plaintiffs are correct that *Scott* (mostly) remains good law, our Supreme Court rejected *Scott*'s "almost any causal connection" standard because it was "discredited and inconsistent with current law to the extent it suggests a plaintiff may meet the statutory causation

connection between a motor vehicle accident and an injury too attenuated to satisfy MCL 500.3105(1). See, e.g., *McPherson*, 493 Mich at 298-299.

Reviewing the evidence in this case, Wolf sustained a grade 3 AC joint separation as a result of the 2018 accident. He testified that he went back to work shortly after the accident, and that, while he hoped his injury would get better over time, it never did in part because of "repetitive use" at work. In June 2019, Wolf at the very least severely aggravated (if not further injured) his shoulder at work by reaching under his desk, which caused Wolf so much pain that he had to leave work and go to the emergency room. No images were taken of Wolf's shoulder at the ensuing emergency room visit, however, so it is unclear how much, if any, damage was done to the shoulder in the June 2019 incident. Eventually, in December 2019, images of Wolf's shoulder were taken, and the images revealed that Wolf's shoulder had worsened to a grade 5 AC joint separation. Dr. Boyd opined at that time that Wolf's shoulder would ultimately require surgery. Then, in January 2020, Wolf had to go to the emergency room a second time because he experienced increased pain in his shoulder while lifting materials at work. While the report from this visit stated that Wolf still had a grade 3 AC joint separation, the radiology report from the visit confirmed that the AC joint separation had widened from 13 mm to 4 cm. Also, notably, the emergency room report noted that Wolf's injury "is actually work-related now," further muddying whether Wolf's grade 5 AC joint separation was caused by the 2018 accident or an intervening event. Two days following Wolf's January 2020 visit to the emergency room, Dr. Boyd confirmed that Wolf's grade 5 AC joint separation shoulder would require surgery. All this evidence, taken together, creates a murky picture whether Wolf's AC joint separation naturally worsened over time or whether intervening events caused Wolf's injury to worsen to the point that surgery was required.

Yet both parties are contending that they are entitled to summary disposition on these facts.[2] When considering whether defendants are entitled to summary disposition, the evidence must be viewed in the light most favorable to plaintiffs. Doing so, the evidence supports that Wolf suffered an AC joint separation in the 2018 accident, and that injury became gradually worse over time until the pain became untenable and Wolf opted to have surgery to repair his damaged shoulder. While Wolf went to the emergency room in June 2019, no images of his shoulder were taken, so there is no objective evidence showing that the June 2019 work incident worsened Wolf's shoulder injury. It was not until December 2019 that images were taken of Wolf's shoulder, and he was diagnosed with a grade 5 AC joint separation at that time. While Wolf went to the emergency room a second time on January 6, 2020, nothing suggests that his shoulder injury was any worse—it remained a grade 5 AC joint separation. From this evidence, a juror could reasonably conclude that Wolf's injury requiring surgery was caused by the 2018 accident, even though that accident took place two years before the surgery.

requirement without proving the causal connection was more than incidental, fortuitous, or but for." *Oostdyk v Auto Owners Ins Co*, 498 Mich 913, 913 (2015) (quotation marks and citation omitted).

[2] For clarity, defendants paid for the treatment of Wolf's shoulder prior to January 6, 2020. Only benefits potentially payable after that time are in dispute.

Conversely, considering whether plaintiffs are entitled to summary disposition—and thus viewing the evidence in the light most favorable to defendants—Wolf suffered an AC joint separation in the 2018 accident, he admitted to making his shoulder injury worse at work through "repetitive use," he had to go to the emergency room at least twice because specific incidents at work caused severe pain to his shoulder, and, in the two years after the accident during which these events occurred, Wolf's injury objectively worsened from a grade 3 (13 mm) to a grade 5 (4 cm) AC joint separation. From this evidence, a juror could reasonably conclude that, while Wolf's grade 3 AC joint separation was caused by the 2018 accident, the passage of time (two years) and intervening events (incidents at work that caused Wolf to seek emergency-room treatment to address his shoulder pain) rendered Wolf's *grade 5* AC joint separation that required surgery too attenuated from the 2018 accident.

In effect, resolution of the parties' dispute comes down to what caused Wolf's AC joint separation to worsen and require surgery—did it naturally worsen over time (as plaintiffs argue) or did it worsen because Wolf caused greater damage by reinjuring his shoulder while at work (as defendants argue)? Both theories have evidence support, so resolution of the issue should be left to a factfinder, not resolved at the dispositive motion stage.[3]

## IV. MCL 500.3109(1)

In the parties' second argument, they dispute whether the trial court properly granted defendants' motion for summary disposition on the basis of Wolf's failure to use reasonable efforts to obtain workers' compensation benefits. We conclude that the trial court erred in this regard, and that Wolf's failure to pursue available workers' compensation benefits did not entitle defendants to summary disposition.

MCL 500.3109(1) states, "Benefits provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury under this chapter." Workers' compensation benefits are one type of benefit that this statute allows no-fault insurers to subtract from payable PIP benefits. See *Perez v State Farm Mut Auto Ins Co*, 418 Mich 634, 641; 344 NW2d 773 (1984) (opinion by LEVIN, J.).

---

[3] While this conclusion finds support in the competing medical opinions offered by the parties, we do not rely on those opinions. Dr. Christian Bentley opined in his report that Wolf's grade 5 AC joint separation was likely the result of his June 2019 work incident. Dr. Peter Ugolini, in a competing affidavit, opined that Wolf injured his AC joint in the 2018 accident, and that it was this injury that required surgery in 2020. Defendants point out, however, that Dr. Ugolini's affidavit is unnotarized, rendering the affidavit invalid. See *Detroit Leasing Co v City of Detroit*, 269 Mich App 233, 236; 713 NW2d 269 (2005) ("[A] document that is not notarized is not a 'valid affidavit.' "). Plaintiffs counter that, if this Court cannot consider Dr. Ugolini's opinion because his affidavit is unnotarized, then it should likewise disregard Dr. Bentley's opinion, because his report is also unnotarized. We would conclude that a question of fact exists on the facts of this case regardless of whether we considered both Dr. Bentley's and Dr. Ugolini's opinions, neither's opinion, or only one of their opinions.

The plurality opinion from our Supreme Court in *Perez* interpreted the "provided or required to be provided" language in MCL 500.3109(1) as follows:

> By declaring that workers' compensation payments "provided or required to be provided" are to be subtracted from a no-fault recovery, the Legislature appears to have set forth a straightforward answer to the question it was addressing: an injured worker *must* pursue available workers' compensation payments because they are deductible simply by virtue of their availability. The "required to be provided" clause does not mean that sums payable as workers' compensation that are not available to the injured worker because his employer failed to provide workers' compensation coverage are nonetheless to be subtracted from no-fault work-loss benefits.
>
> The "required to be provided" clause of § 3109(1) means that the injured person is obliged to use reasonable efforts to obtain payments that are available from a workers' compensation insurer.[18] If workers' compensation payments are available to him, he does not have a choice of seeking workers' compensation or no-fault benefits; the no-fault insurer is entitled to subtract the available workers' compensation payments even if they are not in fact paid because of the failure of the injured person to use reasonable efforts to obtain them.
>
> ---
>
> [18] This construction of the "required to be provided" clause of § 3109(1) is consistent with a common definition of the word "require". One panel of the Michigan Court of Appeals, in construing § 3109(1), has said that "the plain meaning of 'require' (as shown in *Webster's New World Dictionary*) is 'to ask or insist upon, as by right or authority; demand' ". [*Thacker v Detroit Auto Inter-Ins Exch*, 114 Mich App 374, 378; 319 NW2d 349 (1982)].
>
> Consistent with this definition, the "required to be provided" clause of § 3109(1) means that Perez and Lopez must "ask, demand, or call" for any workers' compensation payments that are available to them. If, however, those payments are unavailable to Perez and Lopez because their employer failed to provide workers' compensation coverage, this provision does not mandate that they nonetheless be subtracted from no-fault work-loss benefits.

[*Perez*, 418 Mich at 645-646 (opinion by Levin, J.) (footnote omitted).]

Based on *Perez*, Wolf, as the injured worker, was required to "pursue available workers' compensation payments because they [were] deductible simply by virtue of their availability." *Id*. at 645. This meant that Wolf was required to " 'ask, demand, or call' for any workers' compensation payments that [were] available to" him. *Id*. at 645 n 18.

Despite this, Wolf's failure to pursue workers' compensation benefits did not entitle defendants to summary disposition for at least three reasons. First, as plaintiffs point out, defendants themselves could have pursued workers' compensation benefits on behalf of Wolf. See *Adanalic v Harco Nat Ins Co*, 309 Mich App 173, 188-189; 870 NW2d 731 (2015). As such,

Wolf's failure to pursue workers' compensation benefits did not preclude the practical application of MCL 500.3109(1), nor did it frustrate that statute's purpose.

Second, defendants are only entitled to subtract "[b]enefits provided or required to be provided," and the parties dispute whether Wolf's injuries would have qualified for workers' compensation benefits. More specifically, the parties dispute whether the at-issue injury suffered by Wolf occurred in the course of his employment.[4] MCL 418.841(1) states, "Any dispute or controversy concerning compensation or other benefits shall be submitted to the bureau and all questions arising under this act shall be determined by the bureau or a worker's compensation magistrate, as applicable." Our Supreme Court has explained that this means "the bureau has exclusive jurisdiction to decide whether injuries suffered by an employee were in the course of employment." *Sewell v Clearing Mach Corp*, 419 Mich 56, 62; 347 NW2d 447 (1984). Here, the trial court concluded that Wolf was entitled to workers' compensation benefits because he "reported two [workplace] incidents, which lead to exacerbation of his preexisting injuries." The trial court could not make this determination, however. Only the workers' compensation bureau could resolve the parties' dispute over whether the injury suffered by Wolf was in the course of his employment. See *id*.

The third reason that Wolf's failure to pursue workers' compensation benefits did not entitle defendants to summary disposition is that nothing in MCL 500.3109(1) suggests that it absolves defendants of their responsibility to pay PIP benefits. Under MCL 500.3105(1), defendants remain liable for PIP benefits if Wolf's injury requiring surgery arose from the motor-vehicle accident. See *Specht v Citizens Ins Co of Am*, 234 Mich App 292, 298; 593 NW2d 670 (1999) (explaining that there was no need for "a determination whether the accident occurred during the course of plaintiff's employment" because "defendant's liability depended only on whether plaintiff was injured during the course of an accident covered by the no-fault policy that she purchased from defendant"). If the factfinder determines that Wolf's injury arose from the motor-vehicle accident, then defendants are required to pay PIP benefits, and will be entitled to setoff that amount with any workers' compensation benefits Wolf is entitled to receive, as determined by the bureau. See *Conway v Contl Ins Co*, 180 Mich App 447, 450; 447 NW2d 761 (1989) ("Since the purpose of no-fault insurance is to pay insureds promptly for economic losses, it would defeat the purpose of no-fault insurance if we were to allow an insurance company to delay payments in its hope that it was entitled to reimbursement.") (Cleaned up); *Specht*, 234 Mich

---

[4] The plurality opinion in *Perez* stated, "Where workers' compensation benefits are available, but the injured worker does not exercise reasonable efforts to obtain them, the particular purpose of § 3109(1) to contain the cost of no-fault insurance prevails and the workers' compensation benefits are required to be subtracted from the no-fault benefits." *Perez*, 418 Mich at 648. Defendants and the trial court seemed to rely on this statement to conclude that defendants were entitled to summary disposition. Yet the plain language of MCL 500.3109(1) states that defendants can only subtract benefits "required to be provided" under the workers' compensation law. It follows that, if no workers' compensation benefits were "required to be provided" to Wolf, then defendants cannot subtract those benefits pursuant to MCL 500.3109(1), regardless whether Wolf exercised reasonable efforts to obtain the benefits.

App at 296 ("Nevertheless, the no-fault carrier is not entitled to delay payments in order to wait for the bureau's determination.").

Reversed and remanded for further proceedings. We do not retain jurisdiction.

/s/ Michelle M. Rick
/s/ Douglas B. Shapiro
/s/ Colleen A. O'Brien